UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

UNITED STATES OF AMERICA

      - against -                17 Cr. 7 (JGK)

DUANE MOORE,                    ORDER

                   Defendant.
————————————————————————————

JOHN G. KOELTL, District Judge:

    The Court has received the attached application for compassionate release from the defendant, Duane Moore. The Court asks the Federal Defenders to represent the defendant in connection with this application and to submit any additional papers in support of the application. The Government should respond 21 days after any additional papers submitted by the defendant and the defendant can reply 14 days thereafter.

SO ORDERED.

Dated:    New York, New York
          February 19, 2021      _____/s/ John G. Koeltl_____
                             John G. Koeltl
                     United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DUANE MOORE,                                         :
   Petitioner,                       :
                                                 :
                                                 :
                                                 :
v.                                                   :    Case No.: S1  1:17-CR-00007-001
                                                 :
                                                 :
                                                 :
UNITED STATES OF AMERICA,                            :
   Respondent.                       :


## MOTION FOR COMPASSIONATE RELEASE
## PURSUANT TO TITLE 18 U.S.C. § 3582(c)(1)(A)(i)

COMES NOW, Duane Moore, Petitioner, *pro-se*, respectfully motions this Honorable Court

for an order reducing his sentence to time served based upon the combination of three

"extraordinary and compelling reasons," under 18 U.S.C. Section 3582(c)(1)(A)(i), as amended

by the First Step Act ("FSA"). See P.L. 115-391, 132 Stat. 5194 at § 603 (December 21, 2018).

First, in light of the global COVID-19 pandemic and Petitioner's contraction of the deadly virus.

He is currently quarantined to the second floor of his housing unit. He does not have access to a

computer, typewriter, or copy machine. He has been locked on the second floor since

Thanksgiving with 83 infected inmates with no staff or medical attention. Second, is because of

Petitioner's medical condition. And third, Petitioner's impeccable prison conduct and

post-conviction rehabilitation. The ensuing pages provide support thereof.

1.

## ***PRO-SE* SUBMISSIONS LIBERALLY CONSTRUED**

"A document filed *pro-se* is to be liberally construed and *pro-se* submissions, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *See Estelle v. Gamble,* 429 U.S. 97, 112, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "[I]n a pro-se case, the court must view the submissions by a *pro-se* litigant to a more lenient standard than that accorded to 'formal pleadings drafted by lawyers...'" (*See Haynes v. Kerner,* 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)).

## **JURISDICTION**

Mr. Moore has been in federal custody in connection with an underlying offense of bank robbery since December 23, 2016, which amounts to over 49 months of actual incarceration. After accounting for good conduct time, he has only 42 months remaining on his sentence. On January 11, 2021, Mr. Moore exhausted his required procedures under 18 U.S.C. § 3582(c) because thirty days had elapsed since he submitted a request for compassionate release to David Ortiz, the warden of FCI Fort Dix on December 12, 2020. Warden Ortiz did not respond to the request. Because § 3582(c) "unambiguously provides that a defendant may either move for compassionate release after the defendant has fully exhausted administrative remedies or 'the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier,'" Mr. Moore has fully exhausted. *United States v. Smith,* -- F. Supp. 3d --, 2020 WL 5106694, *3 (M.D. Fla. Aug. 31, 2020). *See Also United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. July 20, 2020) (Per Curiam) (Holding that exhaustion passes thirty days after filing a request to the Warden, even if the Warden denied the request within thirty days);

2.

*United States v. Alam,* 960 F. 3d 831, 834, 836 (6th Cir. 2020) (Sutton, J.) (Holding that § 3582(c) does not require exhaustion even for a denial within thirty days). Accordingly, Mr. Moore appropriately files this motion pursuant to 18 U.S.C. § 3582(c)(1)(A); *See e.g. United States v. Brooker,* 976 F. 3d 228, 234-36 (2d Cir. Sept. 25, 2020).

## BACKGROUND

The United States District Court for the Southern District of New York entered a judgment convicting Petitioner of Bank Robbery, Fire Arm Use, and Possession in Relation, in violation of 18 U.S.C. §§ 2113(a) and 924(c)(1)(A)(i), docket number S1 1:17-CR-00007-001. This Court sentenced Petitioner to 108 months imprisonment under a 3559 PLRA sentence on December 1, 2017. His total prior jail credit time at sentencing was 343 days. His projected statutory release date is August 23, 2024. After incarceration, Petitioner will be subject to a 3-year term of supervision.

## PETITIONER'S MEDICAL CONDITIONS

1. Irritable Bowel Syndrome ("IBS")
2. Hyperlipidemia
3. Arthritis
4. Exposure to COVID-19

## **MEDICATIONS**

1. Calcium Polycarbophil 625 mg tab.

2. Meloxicam 15 mg tab.

3. Atorvastatin 20 mg tab.

## **MERITS**

In the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility. *See United States v.Feiling,* 2020 U.S. Dist. LEXIS 64428, 2020 WL 1821457, at *7 (E.D. VA Apr. 10, 2020); *United States v. Dungee,* 2020 U.S. Dist. LEXIS 59511, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020); *United States v. Harper,* 2020 U.S. Dist. LEXIS 73870.

As of January 11, 2021, there are 797 confirmed COVID-19 inmate infections and 26 infections among the staff at FCI Fort Dix. Moreover, Petitioner's medical conditions, which include hyperlipidemia, show a "particularized susceptibility" to COVID-19. *Feiling,* 2020 U.S. Dist. LEXIS 64428, 2020 WL 1821457, at *7. These factors combined with Petitioner's advanced age constitute extraordinary and compelling reasons for compassionate release. See *United States v. Edwards,* 2020 U.S. Dist. LEXIS 60095, 2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020) (finding that an immunocompromised inmate housed at a facility with confirmed COVID-19 cases has shown compelling reasons for release).

Additionally, because of the above, he has shown "other reasons," in combination with his underlying medical conditions, so his release is consistent with the policy of the Sentencing Commission.

4.

**I.    The COVID-19 Pandemic, Coupled with the Petitioner's Medical
       Conditions, Constitutes Extraordinary and Compelling
       Circumstances that Warrant Compassionate Release.**

"SARS-CoV-2, the novel Coronavirus, and COVID-19, the disease it causes, have spread

across the world and have impacted the lives of hundreds of millions of people. The United

States of America is currently reporting more confirmed cases of COVID-19 and resulting

deaths than any other county." *United States v. Vazquez-Torres,* No. 19-CR-20342, 2020 WL

4019038, at *1 (S.D. Fla. July 14, 2020). This pandemic "poses a serious danger to society, and

especially to at-risk or vulnerable inmates." *United States v. Huarte,* No. 11-CR-20587, 2020 WL

442987, 2020 WL 4429424, at *1 (S.D. Fla. July 31, 2020).

The federal government has recognized this unprecedented risk. *See Attorney General Barr*

*Memorandum* April 3, 2020 (finding that COVID-19 is "materially affecting the functioning of the

Bureau of Prisons" and emphasizing the BOP's "profound obligation to protect the health and

safety of all inmates"). Likewise, "[c]ourts around the country have recognized that the risk of

COVID-19 to people held in jails and prisons is significantly higher than in the community, both

in terms of transmission, exposure, and harm to individuals who become infected." *United*

*States v. Chopra,* No. 18-CR-20668, 2020 WL 4333507, at *3 (S.D. Fla. July 24, 2020) (internal

citations omitted). In particular, "BOP Medical Director Dr. Jeffrey Allen commented that

'[a]symptomatic transmission has caused particular challenges[.] It illustrates the infectivity of

the disease and difficulty controlling it in correctional environments.'" *Id.*

Certain medical conditions increase the risk for severe complications and death from

COVID-19. Similarly, the Center for Disease Control ("CDC") describes a plethora of medical

conditions that present a likelihood of increased risk from COVID-19. It warns that "[p]eople of

any age" with cancer, obesity, serious heart conditions, or diabetes **"are at increased risk** of

severe illness from COVID-19." The CDC also reports that individuals with hypertension or high

blood pressure "might be at an increased risk," *Id.*

5.

Here, Petitioner presents exactly such a case: Amid this unprecedented pandemic, Mr. Moore, an unhealthy sixty-two-year-old, is confined to a prison cell, waiting for the worst. His advanced age and confirmed medical conditions render him uniquely susceptible to serious consequences, including death from COVID-19 infection.

At present, Petitioner can do little to protect himself from these high risks. As described previously, Mr. Moore comes into close contact with other inmates every day at FCI Fort Dix. This contact is inevitable whenever he needs to use the restroom, obtain his meals, or communicate with his family or counsel. While he remains in BOP custody, it is "virtually impossible for [Mr. Moore] to adequately protect himself against infection," *United States v. Schumack*, No. 14-CR-80081-CR, 2020 WL 4333526, at *4 (S.D. Fla. June 11, 2020). A compassionate release would enable the Petitioner to socially distance himself from others and drastically reduce his potential exposure to the disease.

## II.   The Uncontrolled Outbreak at FCI Fort Dix Severely Increases the Petitioner's  Risk of Contracting COVID-19

Currently, FCI Fort Dix is the BOP's second-highest infected facility in the entire system. The current outbreak is the second major uncontrolled outbreak during this pandemic. And as befitting a facility that persistently cannot protect prisoners in its care, Fort Dix's COVID-19 outbreak owes not merely a chance, but to the choices of the BOP. The scope and pace of the new Fort Dix outbreak is staggering. On October 29, 2020, the BOP reported 59 positive prisoners and 8 positive staff members with active cases of COVID-19. See https://www.nj.com/news/2020/10/i-think-i-am-going-to-die-inside-a-coronavirus-outbreak-at-a-nj-federal-prison.html.

6.

*See also BOP Coronavirus tracker* at https://www.bop.gov/coronavirus/index.jsp (accessed

October 29, 2020). In the ensuing 24 hours, the number of positive prisoners, even as

acknowledged by the BOP, nearly tripled. In its daily update on Friday, October 30, 2020, the

BOP reported 165 positive prisoners with active COVID-19, along with 8 staff members. *See*

*"Reported coronavirus cases nearly triple overnight at N.J. federal prison as outbreak*

*continues."* https://www.nj.com/news/2020/10/covid-19-outbreak-at-nj-federal-prison- continues-

as-reported-cases-nearly-triple-overnight. (BOP tracker accessed Oct. 30, 2020).

By Thursday, November 5, 2020, the number had increased to 214 active cases among

prisoners and 10 among staff. (*BOP Coronavirus tracker* accessed November 5, 2020). The

magnitude of this situation is incomprehensible, and the infection rate has rapidly and

consistently risen from October 2020 to February 2021, and it seems the end is nowhere in

sight.

NJ Advance Media journalist, Joe Atmonavage, in his January 5, 2021, article entitled

"'Absolute chaos and terrifying.' The coronavirus is running rampant through N.J. prison again,"

shared information to the public in connection with the Fort Dix outbreak. He wrote:

> A little more than a month after Fort Dix prison reported the most coronavirus
> cases of any federal facility in the country, an Assistant U.S. Attorney wrote to
> a federal judge that the correctional institution had the virus under control with
> only 13 inmates positive as of Dec. 17. Fast forward to now and Fort Dix is
> once again the epicenter of the virus in the federal prison system less than
> three weeks after the first significant wave was tamped down. Nearly 600
> inmates out of 2,700 are positive with the virus as of Tuesday, putting the
> low-security prison once again at the top of the list for the number of cases in
> the federal prison system, according to the BOP.
> In interviews and court documents, inmates and their families said the
> situation is getting worse by the day as the outlook becomes increasingly
> dire.
>
> "It is inhumane the way they are being treated," said Jane Pomroff, whose
> son has 15 months left on his sentence for drug charges.
>
> While Assistant U.S. Attorney Angelica M. Sinopole wrote to a federal judge
> in December that the Bureau of Prisons (BOP) has taken "proper steps to
> prevent further spread of infection and many of the infected individuals
> already have recovered," inmates describe a different scene.

7.

Siddeeq Williams, who is serving a 10-year sentence on drug distribution charges, said he is still suffering from symptoms after contracting the virus in October. His pleas for medical help were being ignored, Williams wrote to a federal judge, adding that the number of cases would be "staggering" if the prison were actively testing inmates, according to court documents.

"Your honor, this is a cry for help," Williams wrote to the judge on Jan. 2. "I am in the middle of the largest COVID-19 outbreak in the federal prison system and I'm sick. I don't want to die here. Please send me home where I can get the medical help I need."

"My cries for help are being ignored," the father of five wrote.

Tess Borden, an attorney for the American Civil Liberties Union (ACLU) who has been monitoring the prison's response to the pandemic, said the "BOP has failed to keep these people in its custody safe and healthy," including properly testing, quarantining, and releasing inmates.

"Every time I speak to someone at Fort Dix or to their families, I hear desperation on the other end of the line," she said. "People fear for their lives."

One woman, who asked not to be identified out of fear of retaliation for her son, said her son was transferred from Ray Brook federal prison in New York to Fort Dix in mid-December. She said he was placed in quarantine with around 60 other inmates who had also been transferred in from around the country.

He received two negative tests upon leaving Ray Brook, she said. He has since tested positive for COVID-19 while being held at Fort Dix. He is quarantining in "horrible conditions" with no hot water, his mother said. He is set to be released as early as Feb. 2.

"It's like they sending you to Fort Dix to try and kill you," the woman said. "Why would they send you there when you have a short amount of time like him?"

"It's absolute chaos and terrifying for everyone," Wragg said in a message via his wife. "Our health and lives are at risk and there's been no true signs of trying to fix this whatsoever. Many of us, including myself, have severe lingering health complications due to our COVID-19 diagnosis that could have absolutely been avoided."

Also worth consideration, is the fact that the current 797 confirmed cases understate the

true severity of the outbreak at FCI Fort Dix. Even before this outbreak, courts across the country have observed that the BOP's reported numbers have persistently understated the danger at the facility throughout this pandemic, and that the infection rate in Fort Dix is likely higher than that acknowledged by the BOP. *See e.g. United States v. Robinson*, No. 3:10-CR-26, 2020 WL 4041436 (E.D. Va. July 17, 2020) (granting compassionate release to a prisoner at Fort Dix suffering from hypertension, and observing that "the BOP positivity rate of twenty-nine percent supports the argument COVID-19 likely is worse than the numbers of confirmed cases actually reported"). Similarly, courts have criticized FCI Fort Dix for its failure to engage in meaningful COVID-19 testing even after it had experienced one widespread outbreak. *See United States v. Hayes*, No. 17-CR-20292, 2020 WL 4001903, at *3 (E.D. Mich. July 15, 2020) (granting compassionate release to a prisoner at Fort Dix and noting that "the BOP's admitted failure to implement any comprehensive prophylactic testing program calls into doubt the undoubtedly optimistic figures that it has reported"); *see also United States v. Brown,* No. 133-CR-176, 2020 WL 5801494 at *2 (E.D. Pa. Sept. 29, 2020) (granting compassionate release to a prisoner at Fort Dix and observing that "the large population at Fort Dix, along with the lack of testing at the facility, may fail to accurately portray the crisis at the prison"). All of these courts made these observations **before** this new outbreak came to light.

Courts have similarly faulted Fort Dix and the BOP for constant failures to take even the most modest possible precautions. Warden Ortiz admitted very early on that "social-distancing is not possible" at this facility because Fort Dix is a low-security facility where most prisoners live in twelve-person rooms and have substantial shared spaces for meals and other services even during the pandemic. Jeremy Roebuck, As COVID-19 spreads behind bars at Fort Dix, inmates turn to contraband cellphones and social media for help, May 4, 2020; *see also*

9.

*United States v. Chappell,* No. 16-CR-512-LTS, 2020 WL 4194914 at *3 (S.D. N.Y. July 21, 2020)

(describing social distancing as "a practice that is impossible in the physical layout of the Fort Dix

facility"). The limited remedial measures that the BOP implemented during Fort Dix's first outbreak

have been rolled back; prisoners and their attorneys have reported that Fort Dix has ceased

taking prisoner's temperatures to screen for possible infection, soap dispensers have been

removed, and supply of cleaning agents have dwindled. The BOP claims to have made efforts to

reduce the spread of the virus in Fort Dix since that initial outbreak, but even the BOP

acknowledges, for example, that it did not institute a policy requiring staff to wear masks until

August 27, 2020, and to this day permits correctional staff to continue working even after potential

exposure to COVID-19. *See Fed. Bur. of Prisons Memo for Chief Executive Officers, Mandatory

Use of Face Covering for BOP Staff* (Aug. 24, 2020) available at

https://www.bop.gov/foia/docs//Mandatory_Use_Face_Coverings_for_Staff_08242020.pdf

(including religious and medical exemptions, and contemplating outright refusal to wear masks);

see also Fed. Bur. of Prisons, COVID-19 Pandemic Response Plan, BOP Employee Management

(Sept. 11, 2020), available at https://www.bop.gov/foia/docs/Mod_11_Employee_

Management_of_COVID_Pandemic_Response_Plan_08312020.pdf. (defining potential exposure

only to include more than 15 minutes of unmasked time within 6 feet of someone with confirmed

or suspected COVID-19, despite transmission not requiring such sustained lose contact).

This explosive second outbreak stems not merely from negligence, it follows directly from the

BOP's own poor choices. As the government has acknowledged in a different forum, shortly

before the large-scale outbreak, the BOP affirmatively transferred at least 13 prisoners into Fort

Dix **who actively had COVID-19 upon arrival.** *United States v. Naik*, No. 2:18-CR-190, Doc. 21

at 3 and n.1 (D.N.J. Oct. 9, 2020) Within three days of that acknowledgment, five prisoners

10.

at Fort Dix tested positive for COVID-19. See *Reported Coronavirus cases nearly triple, supra.* As part of reinstituted intra-agency transfers, the BOP transferred more than 200 prisoners from FCI Elkton to FCI Fort Dix. *Id.* (quoting a Fort Dix correctional officers' union official), a prison that had experienced an uncontrolled outbreak of COVID-19. *See e.g. Wilson v. Williams*, 455 F. Supp. 3d 467, 470-74 (N.D. Ohio May 19, 2020); *see also BOP Coronavirus tracker* (acknowledging 736 positive tests at the facility since the beginning of the pandemic). In addition to having closely followed the transfers from Elkton, the large-scale outbreak also followed the resumption of social visits for prisoners at Fort Dix. *See Reported Coronavirus cases nearly triple, supra.* The BOP relaxed visitation rules just as COVID-19 cases spiked in the region and nation.

In light of this self-inflicted outbreak, other courts have acknowledged the circumstances at FCI Fort Dix and ordered the release of prisoners, from that facility. Courts across the country recognized that circumstances serve as a powerful rebuttal to government assertions that the BOP can maintain the safety of prisoners and staff. One court granted a reconsideration motion for release after having denied a prisoner's motion in August 2020, because of "the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak at FCI Fort Dix," which "substantially diminish[es] his ability to provide self-care." *Mongelli,* 2020 WL 6449237 at *3 (internal quotation to U.S.S.G. § 1B1.13(1)(A) omitted). The Court specifically noted that Mr. Mongelli would "be better able to access whatever care and treatment he may require in the future if he is not incarcerated" at Fort Dix. *Id.*

At other facilities, safe conditions have transformed into unsafe ones at terrifying speeds. *id.* at n.1 (describing the outbreak at FCI Butner, where COVID cases increased from 12 to 658 in a month and a half); *United States v. McGee,* 2020 WL 3884567 at *2 (S.D. Fla. May 18, 2020) (describing the outbreak at defendant's facility, where COVID-19 cases increased from zero to thirty in one week).

11.

Accordingly, the Court should not wait for the COVID outbreak to exacerbate before releasing Mr. Moore. As an outbreak of this magnitude intensifies the Petitioner will be in extreme danger, no matter how the BOP responds. Given his "high risk factors," the prison environment is unsafe for Mr. Moore as long as COVID-19 continues to spread in the United States. The unique risk of harm that COVID-19 poses to Mr. Moore within the confines of Fort Dix constitutes an extraordinary and compelling reason that warrants a compassionate release.

## III. The Relevant § 3553(a) Sentencing Factors Warrant Reducing Mr. Moore's Sentence to Time Served or Resentencing Him to A Period of Home Confinement as a Condition of Supervised Release

### A. Mr. Moore Has Served Over 55% of His Prison Sentence

Mr. Moore has served over 4 years in prison. Accounting for his good time credits, he has served over 55% of his prison sentence.

As an initial matter, courts regularly account for good time credit in determining compassionate release eligibility. For example, in *United States v. Lima*, the court found that the defendant had served 50% of her sentence after accounting for "gain time." No. 16-CR-20088, 2020 WL 4343836 at *2 (S.D. Fla. May 11, 2020). Having already found that her health conditions constituted "extraordinary and compelling circumstances," the court ordered the defendant's release. Id.

Mr. Moore qualifies under the same analysis. With good time credits, his projected release date is August 23, 2024. He has already served over 4 years in prison—over 55% of his time. Even if the Court does not account for good time credit, it should nonetheless exercise its discretion to release Mr. Moore. Several courts have granted compassionate release even when inmates had served less than half of their sentences. In *United States v. Huarte*, for example, the court granted compassionate release to a defendant who had served "nine long years."

12.

No. 11-CR-20587, 2020 WL 4429424 at *2 (S.D. Fla. July 31, 2020). It did so even though her time equaled 48% of her sentence because of "the increased risk of death posed by COVID-19 pandemic and Huarte's severe health conditions." *Id.* On January 5, 2021, a federal judge in this circuit ordered compassionate release to a 46-year-old FCI Fort Dix inmate after serving 42 months of his 100-month sentence. In light of the massive COVID-19 explosion at Fort Dix, Judge Thompson, in his order for release stated, "defendant's personal growth and change of outlook since he committed the offense," combined with "medical conditions, the Court believes that a time served sentence is appropriate…" *See United States v. Brian Page*, No. 3:15-CR-55-AWT. Mr. Moore prays the Court will give him equal consideration. Surely, he presents an exceptional case for compassionate release, and the First Step Act was designed exactly for situations like this one.

### B. Release Would not Minimize the Severity of the Offense

Mr. Moore has been behind bars for over 4 years. The length of his incarceration not only represents the severity of his misconduct but also accomplishes the objectives of punishment and it fosters respect for the law. *See Huarte, supra* (granting compassionate release for a defendant who participated in a "very serious" $11,000,000.00 fraud conspiracy where she served "nine long years in prison" and was not the most culpable defendant in the conspiracy).

Contracting COVID-19 and falling victim to the consequences associated with the virus certainly does not constitute justice for Mr. Moore, especially considering his elevated risk of death or illness. Courts have used compassionate release as a mechanism to prevent the conversion of a finite prison sentence into a death sentence. See Chopra, supra, at *5 ("I am guided by a simple truth: I sentenced the defendant to 48-months imprisonment, not death or confinement under threat of serious illness. His crime does not justify exposing him to that level of risk."

13.

Attorney General Barr has likewise recognized the need to transfer inmates to home confinement for their safety; the same logic applies to compassionate release. *See Huarte, supra*, at *1 (In light of this unprecedented situation, Attorney General Barr has urged the Bureau of Prisons to transfer inmates to home confinement where appropriate to decrease the risks to their health. (Memorandum from Attorney General April 3, 2020). The memorandum states that inmates over 60 years of age with severe pre-existing medical conditions serving sentences for non-violent crimes may be transferred to home confinement. *Id.* at 2. Inmates who are not transferred to home confinement by the Federal Bureau of Prisons may also file a motion with the district court requesting compassionate release under 18 U.S.C.A. § 3582(c)(1)(A) due to "extraordinary and compelling circumstances.")

### C.  Mr. Moore Has Taken Several Commendable Steps to Rehabilitate Himself

Mr. Moore Works for the Federal Prison Industries A.K.A. UNICOR. He is currently a full-time fabricator. Rigorous research demonstrates that UNICOR participation has a positive effect on post-release employment and recidivism for up to 12 years following release. Inmates who worked in Federal Prison Industries were 24 percent less likely to recidivate than non-program participants and 14 percent more likely to be gainfully employed. These programs had an even greater positive impact on minority offenders, who are at the greatest risk of recidivism. *See* unicor.gov

Petitioner has continued his studies by participating in Adult Continuing Education ("ACE") courses. Ace courses are formal instructional classes designed to enrich inmates' general knowledge in a wide variety of subjects, such as writing, foreign languages, and math. Parenting programs are offered throughout the Bureau of Prisons. These programs are designed to help inmates maintain family ties and parental bonds during incarceration. Activities

14.

Petitioner's PATTERN score is 7, which places him in the "minimum" risk category. Indeed, Mr. Moore has proved, time and time again, that he has no desire to resume any form of criminal activity.


## **RELEASE PLAN**

Upon release, Mr. Moore will live at his child's mother's house in New York. The home is located at 1898 Pacific Street 37, New York, NY 11231. He will seek medical insurance from whom he works for, as medical insurance is a standard component of employment.


## **CONCLUSION**

Mr. Moore's advanced age and serious medical problems place him at high risk of contracting a severe or fatal case of COVID-19. He is a low-risk offender who has an exemplary prison record. He has additionally proposed a sound release plan and will enjoy abundant support from his community.

Accordingly, Mr. Moore most respectfully requests that the Court finds him eligible for compassionate release.


Respectfully submitted,

*Duane Moore*

Duane Moore
#54929-053
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

16.

## **CERTIFICATE OF SERVICE**

    I, Duane Moore, hereby certify under penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing motion is true, correct, and to the best of my knowledge. An exact copy has been placed in an envelope with first-class pre-paid postage affixed to it and sent to the United States Attorney via the United States Postal Service.

    Executed on this 8th day of February, 2021.

Duane Moore